## Richmond

### Randolph Taylor Brown v. Commonwealth of Virginia, *ex rel.*, Kathy Joan Custis.

June 10, 1977.

Record No. 760430.

Present: All the Justices.

*R. Bruce Long (J. Edgar Pointer, Jr.,* on briefs), for appellant.

*C. Flippo Hicks (Andrew P. Miller, Attorney General; Harry A. Morris, Commonwealth's Attorney; Martin, Hicks & Ingles, Ltd., on brief),* for appellee.

HARRISON, J., delivered the opinion of the Court.

The dispositive issue in this case is whether in Virginia the paternity of a child not born of a lawful marriage can be determined in any manner other than in accordance with the provisions of Code § 20-61.1, which concerns the support of the children of unwed parents.

Kathy Joan Custis filed a petition in the Juvenile and Domestic Relations District Court of Gloucester County seeking support for her infant daughter from Randolph Taylor Brown, allegedly the father of the child. The district court ordered Brown to pay $25 a week for the support of his dependent child, and Brown noted an appeal to the circuit court. The court below transferred the case to its chancery side. After a hearing *de novo* it found that the infant involved was the issue of a void marriage between Brown and Mrs. Custis and that, pursuant to Code § 64.1-7, the child was deemed to be legitimate. The court found that it was the obligation of Brown to support his daughter and ordered him to pay $25 a week for that purpose. We granted appellant an appeal.

On August 24, 1968, Kathy Joan Bonniville married Allen Bruce Custis in Gloucester County. On December 29, 1972, while still married to Custis, she married Randolph Taylor Brown, appellant, in Pasquotank County, North Carolina. On September 4, 1973, Mrs. Custis was granted an absolute divorce from Custis by decree of the Circuit Court of Gloucester County. On July 11, 1974, a girl baby was born to Mrs. Custis. Mrs. Custis and Brown lived together as husband and wife for approximately five weeks beginning on December 29, 1972. In February, 1973, Brown temporarily left the area in connection with his duties in the United States Navy, and since that time the parties have not cohabited as husband and wife. Mrs. Custis returned to the home of her parents during the first part of February, 1973, and lived there continuously from that time until this proceeding was instituted. However, from July, 1973, until some time in January, 1974, Brown and Mrs. Custis saw each other "practically every day" from early morning to midnight when he

was not on duty, and from 5 p.m. to midnight when he was on duty. Mrs. Custis testified that during this period she engaged in sexual relations only with Brown. Others also testified to the relationship between Brown and Mrs. Custis and the fact that they were together almost daily from July, 1973 until January, 1974. Two letters were introduced in evidence that Brown wrote Mrs. Custis in January, 1974, in which he expressed his love and strong attachment for her and her son by her former marriage. He sent her five dollars and expressed regret that it was not more. He wrote that if she and her son needed anything while he was gone she was to "just write me and ask for it or ask me when I call". It was also testified that at the time the daughter was born in July, 1974, Brown called Mrs. Custis on the telephone and wanted to know "how our baby was doing".

Code § 64.1-7 provides that "the issue of marriages deemed null in law, or dissolved by a court, shall nevertheless be legitimate". Appellant readily concedes that this Court has decided on many occasions that the children of a bigamous marriage are legitimate under Code § 64.1-7 and its predecessors. However, he contends that Code § 64.1-7, having been enacted for the benefit of the children of bigamous marriages, was not intended to affect the rights of parents and therefore should not affect the question of paternity. In essence, Brown's position is that in the absence of an express admission of paternity it must be proved: that since his marriage to Mrs. Custis was void *ab initio*, they were not married; and that his paternity of the child could be established only by the type of evidence outlined in Code § 20-61.1, which provides, in part:

"**Support of children of unwed parents by father; evidence of paternity.** — Whenever in proceedings hereafter under this chapter concerning a child whose parents are not married, a man admits before any court having jurisdiction to try and dispose of the same, that he is the father of the child or the court finds that the man has voluntarily admitted paternity in writing, under oath, or if it be shown by other evidence beyond reasonable doubt that he is the father of the child and that he should be responsible for the support of the child, the court may then enter and enforce judgment for the support, maintenance and education of such child as if the child were born in lawful wedlock.

"Such other evidence that the man should be responsible for the support of the child shall be limited to evidence of the following:

"(1) That he cohabited openly with the mother during all of the ten months immediately prior to the time the child was born; or

"(2) That he gave consent to a physician or other person, not including the mother, charged with the responsibility of securing information for the preparation of a birth record that his name be used as the father of the child upon the birth records of the child; or

"(3) That he allowed by a general course of conduct the common use of his surname by the child; or

"(4) That he claimed the child as his child on any statement, tax return or other document filed and signed by him with any local, State or federal government or any agency thereof."

Brown denied paternity, and he did not testify. It is conceded that he did not "cohabit openly with the mother [Mrs. Custis] during all of the ten months immediately prior to the time the child was born". Brown therefore argues that paternity was not proved in the manner provided by the statute. He says there has been no voluntary admission of paternity by him, in writing, under oath or before a court, and that his paternity of the child was not established by other evidence admissible under Code § 20-61.1 (1) (2) (3) (4).

■ We do not agree that Code § 20-61.1 is applicable here, or that this section provides the only means by which paternity can be established. The section expressly applies to proceedings instituted under Chapter 5 of Title 20 of the Code of Virginia dealing with desertion and nonsupport and is designed to require support of children of "unwed parents by the father". It is limited to the support of a child "whose parents are not married". The legislature was referring to and providing for the support of the offspring of a meretricious union between a man and a woman. For that reason the statute requires strict and limited proof of paternity. This is presumably to protect a man from a specious claim of fatherhood made by a woman who has not entered into a marriage relationship with the man.

44

We are not dealing here with the child of unwed parents, the offspring of a meretricious relationship. Brown and Kathy Custis were actually married. Apparently their marriage, albeit a void one, was solemnized in a formal manner, and there is a record of it having occurred. The couple lived together as husband and wife and under "the same roof" for at least five weeks after the marriage. Their relationship was marital. After this period they ceased living together as man and wife. Whether this was because the husband was given duty outside the Gloucester County area, because it was discovered their marriage was void, or for some other reason, is not disclosed by the record. However, the evidence does show that a close and intimate relationship existed between these parties and continued until January, 1974. Brown had access to Mrs. Custis and was frequently in her company. As late as January, 1974, after the child was conceived, Brown was professing his great love and concern for Mrs. Custis, the woman whom he had "married" in North Carolina on December 29, 1972.

Brown now seeks to invoke a statute which concerns unwed parents, although the evidence shows conclusively that a marriage was performed and that he did enter into the marriage relationship. If this were only a suit between a bigamist on the one hand and a man who did not want to be financially handicapped on the other, the question would be relatively unimportant. But such is not the case. Involved here is a child's right to support. We have on numerous occasions said that a child should not be deprived of his rights because of statutes affecting the marital status of his parents. Code § 64.1-7 was manifestly enacted for this purpose, and the child here is obviously not excluded from its benefits.

The far-reaching effect of appellant's position that, absent an admission of paternity by the father in the manner provided by Code § 20-61.1, there must be evidence that he cohabited openly with the mother during all of the ten months immediately prior to the time the child was born, can be demonstrated by this illustration. A man and woman formalize a marriage in utmost good faith. They live together as husband and wife for ten years, both believing that they are properly wed. The wife becomes pregnant. One month before her baby is born the parties discover that their marriage is void. The husband leaves the marital home, severs his relationship with

the woman he has lived with as his wife for years, and denies that the child thereafter born is the issue of their marriage. The child could never establish paternity because he could not prove that his mother and father openly cohabited during all of the ten months immediately prior to his birth. Obviously the legislature never intended such a result when it enacted Code § 20-61.1 and related sections. Specifically we conclude it did not intend to impair the jurisdiction of a court of equity to determine in a proper proceeding for the support of an infant, whether such child is "the issue" of "a null marriage".

If we denied a court of equity the right to accord the infant here the benefit of Code § 64.1-7, we would have to ignore the humanitarian principles which underly it. This statute, first adopted in 1785, was among the first American statutes to lessen the harsh treatment of an illegitimate child, known at common law as *nullius filius*, "the son of nobody". The statute has been a model for many states. In *Goodman* v. *Goodman*, 150 Va. 42, 45, 142 S.E. 412, 413 (1928), referring to the statutory ancestors of Code §§ 64.1-6, 64.1-7 and 20-42, we said:

> "These statutes are remedial in their nature and should be liberally construed. When so construed it is apparent that the object and purpose of their enactment was to remove the stain and disabilities of bastardy from all 'innocent and unoffending' children who for any cause might be classed as illegitimate."

While the purpose of the statute has been variously expressed, it was Judge Roane in *Stones* v. *Keeling*, 9 Va. (5 Call) 143, 146 (1804), who best expressed its rationale when he wrote, in reference to the children of a bigamous marriage, that:

> "[I]f the legislature should even be supposed to consider every second marriage, living a first husband or wife, as criminal, wherefore should they visit the sins of the parents upon the innocent and unoffending offspring? But this was not the temper of the legislature.

> \* \* \* \* \*

> "This is a strong case to shew the sense of the legislature that the turpitude, or guilt of the marriage, shall not break upon the heads of their innocent offspring. . . ."

This Court has on numerous occasions held that Code sections addressing desertion and nonsupport do not usurp the inherent jurisdiction of equity to deal with the questions of support and maintenance. In *Heflin* v. *Heflin*, 177 Va. 385, 14 S.E.2d 317 (1941), it was contended that Code §§ 1936-1944a, Code of 1936 (currently Code §§ 20-61 to -88) under the title of "Desertion and Nonsupport", took away from courts of equity their inherent jurisdiction to require a husband to provide for the support of his dependent wife. It was argued there that the language of the sections on support was prohibitive and restrictive, thus abrogating the equity jurisdiction. We held:

"Unless the desertion and non-support statutes (§§ 1936-1944a) prohibit and restrict the long-established inherent jurisdiction of the equity court such jurisdiction remains unaffected by their enactment even though they provide the machinery for the punishment of a husband who deserts and fails to support his wife, leaving her destitute and in necessitous circumstances. We do not think there is any language in the statutes which could be considered as impairing or destroying the equity jurisdiction. . . .

\* \* \* \* \*

"These statutes do not, in terms or otherwise, wipe out the other remedies of a deserted wife. They do not purport to embrace all other remedies for support which may arise, such as those under the divorce statutes and those brought under the inherent jurisdiction of an equity court for separate maintenance alone. The statutes embrace only those cases 'arising under this act,' which means cases in which deserted wives wish to prosecute their husbands criminally and as an incident, if found guilty, to receive their wages if they are physically able to work on the roads. It is an effective means to require them to perform their legal duty.

"The statutes provide an additional and quick remedy, in cases arising under it, to punish the guilty husband for his offense and at the same time prevent the wife from becoming a public charge. They give no civil remedy." 177 Va. at 397-98, 14 S.E.2d at 321.

Thereafter, in *McClaugherty* v. *McClaugherty*, 180 Va. 51, 21 S.E.2d 761 (1942), we had occasion to consider the same statutes

involved in *Heflin, supra,* and Section 5770 of the Code of 1936 (presently Code § 64.1-7). The case involved a suit by an infant to require her alleged father to make provision for the infant's maintenance and support. The respondent admitted that the child was his daughter but denied that she was his legitimate daughter. It was contended that the court was without jurisdiction to hear and determine the case. We held:

"Since it is an inherent right of an infant to demand that he be supported by his father, then it follows that there must be some tribunal to which he can resort to enforce such a right.

\* \* \* \* \*

"Infants have ever been regarded as the wards of a court of equity and where the natural guardian of an infant is derelict in the performance of his legal and moral duty to support his infant child, then a court of equity will intervene in order that such relief may be afforded as the exigencies of the case demand." 180 Va. at 65-66, 21 S.E.2d at 767.

In *McClaugherty,* we also said, after quoting at length and with approval from *Heflin, supra:*

"What is said there in regard to a deserted wife is most apposite when applied to the case at bar. The principle involved is the same. Nether in law nor in morals, should a distinction be drawn between the right appertaining to a deserted wife and the right appertaining to a neglected child." 180 Va. at 67, 21 S.E.2d at 768.

*Accord, State* v. *Bragg,* 152 W.Va. 372, 163 S.E.2d 685 (1968), wherein the court, reviewing a statute identical to Code § 64.1-7, held that it will be applied to further its legislative intent even if this means that a statute on paternity, apparently on point, is given no effect.

Perhaps the case most frequently cited and relied upon where the rights of the children of bigamous marriages are involved is the 1804 case of *Stones* v. *Keeling, supra.* The case involved a contest between the issue of a woman by a second (and bigamous) marriage with the widow and children of a son of the first marriage. This was the first case that considered the Act of the General Assembly which declared the issue of marriages deemed null in law shall nevertheless be legitimated. In the

48

course of the opinion, Judge Roane made this pertinent observation:

"It was also said, that in a case like the one before us, (admitting the contiguous residence of the first husband to the wife during her second coverture,) her children might claim two fathers. The answer is, that their legitimacy under the one, or the other marriage, would depend upon circumstances of access, &c., as in other cases; as in case of a single marriage. Those born during the existence of a lawful marriage are, prima facie, the children of that marriage; but that presumption is liable to be rebutted and destroyed by facts and circumstances, to be adjudged of by courts and juries. *In the case before us, of a second and void marriage, the second husband stands merely on the foot of a stranger; but, with respect to his children begotten by the wife of another, supposed to be his wife, our act steps in and changes the former law; it erects into legitimate children those who otherwise would have been bastards. This, however, depends upon the question of access.* Our act has only laid down the general proposition: an exception from that proposition, exists in other cases, where the second husband had no access. In that case the children, if begotten by a stranger, are bastards; if begotten by the first husband, they are then legitimate children of the first marriage, which has rendered that access and those children lawful." 9 Va. (5 Call) at 148-49. (Emphasis added.)

■ In the case under review the undisputed testimony discloses that Brown did have "access" to Mrs. Custis during the time in which her child was conceived. There is absolutely no evidence that Mrs. Custis carried on any type of relationship with another man. The fact that there was a marriage between the parties, although void, was not in controversy. The trial court, sitting as a court of equity, has found upon credible evidence that appellant is the father of the child born to Mrs. Custis on July 11, 1974. We cannot say that its finding is plainly wrong. Accordingly, the child involved here is the issue of the void marriage had between Brown and Mrs. Custis, is legitimate and is entitled to be supported by her father.

The order of the court below will be

*Affirmed.*