973 F.2d 326
 38 Soc.Sec.Rep.Ser. 457, Unempl.Ins.Rep. (CCH) P 16852A
Debra VEENEY, on behalf of Rafeal N. STROTHER, a minor,
Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 92-1000.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 4, 1992.
Decided Aug. 19, 1992.
As Amended Sept. 28, 1992.
 
 Jamie Britton Aliperti, Rappahannock Legal Services, Inc., Culpeper, Va., argued for plaintiff-appellant.
 Patricia McEvoy Smith, Asst. Regional Counsel, Office of the General Counsel, Dept. of Health & Human Services, Philadelphia, Pa., argued (Eileen Bradley, Chief Counsel, Region III, Office of the General Counsel, E. Montgomery Tucker, U.S. Atty., Richard A. Lloret, Asst. U.S. Atty., Roanoke, Va., on the brief), for defendant-appellee.
 Before ERVIN, Chief Judge, HAMILTON, Circuit Judge, and KELLAM, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 ERVIN, Chief Judge:
 
 
 1
 Debra Veeney applied to the Social Security Administration (SSA) for survivor benefits on behalf of her two sons after their father, Stanley Edward Moore, died. SSA awarded benefits to Cornell, Veeney's older son, but denied them to Rafeal, her younger son. Veeney then appeared at a hearing before an Administrative Law Judge (ALJ), who held that Veeney had not presented sufficient evidence that Moore was Rafeal's father. On appeal, the magistrate judge affirmed. Finding numerous errors in the ALJ's opinion, no substantial evidence in support of the ALJ's decision, and overwhelming evidence that Moore was Rafeal's father, we reverse and remand to the district court with instructions to award benefits to Rafeal.
 
 
 2
 * This case requires us to determine whether the ALJ erred in deciding that Debra Veeney had not presented sufficient evidence that Stanley Moore was the father of Veeney's son, Rafeal Strother. We first set out the facts and decisions below.
 
 
 3
 Debra Veeney gave birth to Rafeal Strother in May 1983. Veeney had given birth to Rafeal's brother, Cornell Strother, in October 1981.[1] Veeney, who was unmarried when her sons were born, did not list the father on either birth certificate. Stanley Moore listed Cornell as a dependent on his 1982 tax return, which led the Commonwealth of Virginia to order Moore to begin paying child support payments in December 1983.[2] In 1984, Moore stopped paying child support when he was imprisoned. Moore died in April 1988.
 
 
 4
 While Moore never acknowledged that he was Rafeal's father on any official forms, the record contains other evidence that he was Rafeal's father. Veeney testified that she was certain that Moore was Rafeal's father because she had not slept with any other men at the time of Rafeal's conception. Veeney and her mother also testified that Moore had acknowledged paternity in a letter he sent Veeney from prison, but that the letter was lost in a house fire that destroyed her parents' home, where Veeney was living at the time. The record also contains affidavits of seven people stating that Moore said he was Rafeal's father; visited Veeney in the hospital when Rafeal was born; visited Rafeal and Cornell three or four times a month; brought Rafeal presents during those visits, on Rafeal's birthday, and at Christmas; and was the "spitting image" of Rafeal. One affiant even stated that it was common knowledge that Moore was Rafeal's father. In addition to the affidavits, Veeney had blood group testing done on Rafeal, Cornell, and Ronnie Moore, Stanley Moore's brother. The blood tests showed that Rafeal and Cornell "probably" had the same biological father; that Ronnie Moore was "likely" the biological uncle of Rafeal and Cornell, by odds of 783,229 to 1; and that Ronnie Moore could not be the boys' father. The tester concluded that the boys' father was likely a member of the Moore family.
 
 
 5
 In May 1988, Veeney applied for the SSA survivor benefits at issue here on behalf of Cornell and Rafeal. The SSA awarded benefits to Cornell, but denied them to Rafeal. Veeney then presented the evidence described above at a hearing before an ALJ in January 1990. In his opinion, the ALJ noted the affidavits and blood testing, but then erroneously stated that Veeney had first disclosed the letter lost in the house fire at the hearing and that "[i]t is the undersigned's consideration that the [state] Court has already ruled that Stanley is not the father and is not required to pay child support [to Rafeal]." Tr. at 19. Then, without discussing the affidavits, the ALJ held that "the blood testing standing alone is insufficient to establish that Stanley is the father for purposes of Social Security benefits." Id.
 
 
 6
 Veeney then requested the SSA Appeals Council to review the ALJ's decision. The Appeals Council acknowledged that the ALJ erred in stating that a state court had "already ruled" that Moore was not Rafeal's father, but determined that the error did "not form a basis to revise the Administrative Law Judge's decision." Tr. at 5.
 
 
 7
 On appeal to the district court, the magistrate judge stated that the ALJ would not have been in error if he had not considered the blood tests at all, based on the intestacy statute in effect in Virginia at Moore's death.[3] The magistrate judge also stated that it was the ALJ's responsibility to weigh "conflicting" evidence. As a result, the magistrate judge affirmed the SSA's denial of survivor benefits to Rafeal.
 
 II
 
 8
 In determining whether Moore was Rafeal's father for purposes of the Social Security Act, "the Secretary shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which ... [Moore] was domiciled at the time of his death." 42 U.S.C. § 416(h)(2)(A). The Act thus requires us to look to the devolution of intestate personal property in Virginia, Moore's domicile at the time of his death, which we do in Part II A below. In Part II B, we address the ALJ's opinion.
 
 
 9
 * Section 64.1-5.2 of the Virginia Code governs the devolution of intestate personal property. At the time of Moore's death, the statute (hereinafter, "former section 64.1-5.2") required clear and convincing evidence that the deceased was the claimant's father and stated that evidence "shall be limited to" the following six items:
 
 
 10
 1. That he cohabited openly with the mother during all of the ten months immediately prior to the time the child was born;
 
 
 11
 2. That he gave consent to a physician or other person, not including the mother, charged with the responsibility of securing information for the preparation of a birth record that his name be used as the father of the child upon the birth records of the child;
 
 
 12
 3. That he allowed by a general course of conduct the common use of his surname by the child;
 
 
 13
 4. That he claimed the child as his child on any statement, tax return or other document filed and signed by him with any local, State or federal government or any agency thereof;
 
 
 14
 5. That he admitted before any court having jurisdiction to try and dispose of the same that he is the father of the child; or
 
 
 15
 6. That he voluntarily admitted paternity in writing, under oath.
 
 
 16
 None of the six types of evidence applied here, because Moore never took any of the specified actions. The government argues that it is clear that Rafeal could not have inherited from Moore, and that the Secretary therefore rightly denied benefits. Under the government's theory, which the magistrate judge appeared to approve, the ALJ should not even have considered the blood test evidence. Although the government stresses the plain meaning of the statute, (evidence "shall" be limited), the Social Security Act states that the Secretary shall apply the law that the courts of the state where the father lived would apply. 42 U.S.C. § 416(h)(2)(A). Thus, the Act requires us to consider more than the plain meaning of this state statute.
 
 
 17
 In deciding what law Virginia's courts would have applied in this case, we must confront a Virginia Supreme Court case that held a statute similar to former section 64.1-5.2 unconstitutional, Jones v. Robinson, 229 Va. 276, 329 S.E.2d 794 (1985). In Jones, the court reviewed former section 20-61.1, which governed determination of paternity for the purpose of child support and listed four types of admissible evidence. The Jones court held that the statute was unconstitutional because it discriminated against illegitimate children. The court reasoned that:
 
 
 18
 Children whose fathers avoided the acts described in § 20-61.1 could never recover support, even if the father openly admitted paternity in ways not specified in the statute. Allowable proof of paternity lay within the absolute control of the father, whose unwillingness to assume voluntarily the obligation of support denied his illegitimate child a right which could not be denied a legitimate child.
 
 
 19
 Id. 329 S.E.2d at 801. The court found no such problem with amended section 20-61.1, which the legislature had amended in 1982 to allow blood testing evidence.
 
 
 20
 It appears that former section 64.1-5.2 had the same constitutional infirmity that Jones found in former section 20-61.1: The listed types of admissible evidence "lay within the absolute control of the father." Indeed, the first four types of evidence listed in former section 64.1-5.2 were identical to the four types of evidence at issue in Jones, and the other two types of evidence were similarly within the father's absolute control. We have not discovered any cases that discussed the effect of Jones on former section 64.1-5.2, but we predict that Virginia courts would have applied Jones to find former section 64.1-5.2 unconstitutional. Furthermore, finding former section 64.1-5.2 inapplicable, the courts would have allowed the admission in an intestacy dispute of blood test results and "any probative evidence." See Jones, 329 S.E.2d at 802. Therefore, the ALJ could not have properly disregarded the blood test evidence and should have considered all probative evidence of Moore's paternity, including the affidavits.[4]
 
 
 21
 The government argues that former section 64.1-5.2 was not constitutionally flawed under Jones because the last paragraph, which followed the six enumerated types of evidence, allowed for blood testing. However, that paragraph only stated that "[i]f a proceeding" for child support has been "initiated and concluded," then a judgment ordering child support "shall be sufficient evidence of paternity." At the time of Moore's death, blood testing was admissible to determine paternity in child support proceedings, in the amended statute that the Jones court had approved. The government's position is that if Veeney had only sought child support for Rafeal from Moore, she could have obtained conclusive proof through tests of Moore's blood that Moore was Rafeal's father, and this case would have been unnecessary. However, former section 64.1-5.2 stated "if" a support proceeding has been initiated and concluded; it did not state that support proceedings "must" have been pursued. Because no child support proceeding on behalf of Rafeal had been initiated, the final paragraph in the statute did not apply by its own terms. Also, there was no reason in this case for Veeney to have sought child support for Rafeal from Moore; he had no estate and was imprisoned soon after Rafeal was born. Indeed, Moore stopped paying Cornell's child support at that time. The final paragraph in former section 64.1-5.2 therefore did not offer a practical alternative to evidence "lay[ing] within the absolute control of the father" to those illegitimate children whose mothers did not seek child support from the fathers because the fathers could not pay it. Thus, we find that the final paragraph of former section 64.1-5.2 either does not apply or does not satisfy the constitutional concern in Jones.
 
 
 22
 Current section 64.1-5.2 supports our conclusion that Virginia courts would have found the former statute unconstitutional. In March 1991, the Virginia legislature amended section 64.1-5.2. While maintaining the clear and convincing standard of proof, the legislature stated that evidence of paternity "may include, but shall not be limited to [eight items]." The amendment specifically allowed "[t]he results of medically reliable genetic blood grouping tests weighted with all the evidence." After setting out these changes, the legislative amendment stated "[t]hat the provisions of this act are declaratory of existing law." That statement indicates that the legislature believed that evidence to establish paternity in intestacy proceedings already had not been limited to the six items previously specified. The government dismisses that statement in a single sentence in its brief, arguing that the phrase is ambiguous. However, we find it apparent that, in stating that the amendments were declaratory of existing law, the legislature was responding to the constitutional concerns that the Jones court raised.
 
 
 23
 The parties focus on one other statute. Section 20-49.1, which was amended in 1990, states that blood tests must establish paternity with 98% probability. The government argues that Veeney did not satisfy the 98% requirement here. However, amended section 20-49.1 only took effect after Moore's death. The legislature did not state that it was declaratory of existing law or give any other indication that it intended the amendment to be retroactive. Furthermore, it is impossible to test Moore for probability of paternity here, because he is dead. The blood test report on Ronnie Moore, Cornell, and Rafeal only stated "N/A," for "not applicable," in the space for probability of paternity. Because either the amendment had not taken effect, or probability of paternity is inapplicable here, the Virginia courts would not apply the 98% requirement in this case.
 
 B
 
 24
 We now turn to the ALJ's determination that Veeney did not present sufficient evidence to meet her burden of proof. The ALJ found that "the blood testing standing alone is insufficient to establish that Stanley is the father for the purposes of Social Security benefits." Tr. at 19. The government argues that we must uphold that finding if substantial evidence in the record supports it, citing 42 U.S.C. § 405(g) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...."). As an initial matter, assuming arguendo that the ALJ properly considered the blood test results "alone," we note that the ALJ's opinion is not supported by substantial evidence.
 
 
 25
 In the discussion in the ALJ's opinion, there is a major mistake in almost every paragraph. First, the ALJ stated that he was "surprised to learn" that no petition had been filed in state court to establish paternity. Tr. at 18. The ALJ noted that a state court determination would have allowed an automatic award of SSA benefits, see 20 C.F.R. § 404.355(a), and that the hearing before him had been delayed for a non-existent state court proceeding. In its brief, the government also repeatedly mentioned the fact that Veeney abandoned the state court proceeding, even claiming that Veeney must have decided that she would lose in state court. However, whether a claimant has pursued her rights in state court does not affect an award of SSA benefits; under the statute, the Secretary must determine whether the child in question would inherit from the deceased parent under state intestate laws. 42 U.S.C. § 416(h)(2)(A). In addition, the ALJ's "surprise" is overstated. It is true that in November 1988 Veeney requested that her ALJ hearing be continued, in order to allow her to pursue a state court paternity determination. However, Veeney asked for at least two more continuances in 1989. On both occasions, Veeney stated that she was waiting for blood test results, which the laboratory had repeatedly delayed, and she did not refer to any pending state court proceeding. The ALJ granted the additional continuances. The ALJ's "surprise" is therefore itself surprising, and appears to be a thinly veiled way of blaming Veeney for not having established paternity in state court first, which the Social Security Act does not require. Furthermore, Veeney has given two uncontroverted reasons for her decision not to pursue the state court paternity proceeding in 1989: (1) Veeney sought to avoid further delay in obtaining a benefits determination--Veeney was not responsible for the delays in the blood test results, and she had first applied for SSA survivor benefits in May 1988; and (2) Moore had no estate for Rafeal to inherit in the first place.
 
 
 26
 Second, the ALJ stated that Veeney's "first mention" of the letter from Moore was at the hearing before him. That is not so. In her May 27, 1988 application for SSA survivor benefits, which was in the record before the ALJ, Veeney wrote next to a question requesting written evidence of Moore's paternity that the "[l]etters he wrote me were burned up." Tr. at 85. It is an undisputed fact that a July 1987 fire destroyed the home in which Veeney lived; Veeney's mother corroborated Veeney's testimony, and a newspaper account of the fire is in the record. Tr. at 157 (article states "most of their possessions destroyed"). Nevertheless, the ALJ determined that Veeney and her mother's testimony about Moore's letter was not credible because "the first mention of the letter was at the hearing." Tr. at 19. The ALJ's credibility determination was thus based on an erroneous belief.
 
 
 27
 Third, two paragraphs later, the ALJ stated that Veeney "had not taken any action to have Rafeal declared to be the child of Stanley Moore until after Stanley's death when she applied for Social Security benefits for Rafeal. Apparently she was willing to accept the child support for Cornell without pursuing the matter of Rafeal at that time." Id. However, the only evidence in the record is to the contrary. A social worker stated that Veeney named Moore as the father of both Cornell and Rafeal in her claim for AFDC benefits, which she made while Moore was alive. Tr. at 90.
 
 
 28
 Fourth, the ALJ reasoned that "[s]ince the court [child support] order specifically excluded Rafeal it is a logical conclusion that the court had found Stanley not to be the father of Rafeal." Tr. at 19. That is not a logical conclusion, though, because the child support order was based on Moore's having claimed Cornell alone as a dependent on his 1982 tax return. The child support order was independent of any court finding about paternity, and, as noted above, the tax return covered a period before Rafeal was born.
 
 
 29
 Similarly, in the next paragraph, the ALJ stated, "It is the undersigned's consideration that the Court [ordering child support] has already ruled that Stanley is not [Rafeal's] father and is not required to pay child support." Id. The SSA appeals council acknowledged that this statement was in error, because no court had ever ruled on the question of whether Moore was Rafeal's father. Although the appeals council concluded that this error alone was not enough to call the ALJ's findings into question, the cumulative effect of all these errors certainly is.
 
 
 30
 Finally, to close his discussion, the ALJ repeated his harangue about Veeney's failure to get a state court paternity determination, see Tr. at 20, which was irrelevant to the question before him. In view of its many errors, we find that it is impossible to conclude that substantial evidence supports the ALJ's conclusion that Veeney had not presented "satisfactory evidence to show that James[sic] Moore was the father of Rafeal Strother." Id. Moreover, the magistrate judge's statement that the task of weighing "conflicting" evidence is best left to the ALJ is not dispositive where, as here, there was no conflicting evidence--every piece of evidence pointed to Moore as Rafeal's father.
 
 
 31
 The government's response is that, even without conflicting evidence and despite the ALJ's many errors, Veeney has not met her burden under section 64.1-5.2 of presenting clear and convincing proof of paternity. That argument is meritless. The blood tests showed that Ronnie Moore, Stanley Moore's brother, was "likely" Cornell and Rafeal's uncle by odds of 783,229 to 1. The tests also showed that Cornell, who without question was Stanley Moore's son, was Rafeal's brother. In addition, Veeney's testimony and the uncontroverted affidavits, which must be considered under Jones, all indicate that Stanley Moore was Rafeal's father. We conclude that, as a matter of law, this evidence as a whole is clear and convincing proof that Stanley Moore was Rafeal's father.
 
 III
 
 32
 After determining that the blood test results and affidavits were admissible evidence, that the ALJ's opinion contained numerous fundamental errors and was not supported by substantial evidence, and that Veeney presented clear and convincing proof of paternity as a matter of law, we see no need to remand for additional factual findings. See 42 U.S.C. § 405(g) (court has power to reverse without remanding for a rehearing); Sahara Coal Co. v. Director, OWCP, 946 F.2d 554, 558 (7th Cir.1991) ("If the outcome of a remand is foreordained, we need not order one."). On remand, the district court shall see that SSA survivor benefits are awarded to Rafeal. Accordingly, the judgment of the district court is hereby
 
 
 33
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 "Strother" is Veeney's maiden name. Since her sons were born, Veeney has married, and her full name is Debra Strother Veeney
 
 
 [2]
 In its brief to this court, the government stressed the fact that Moore claimed Cornell but not Rafeal as a dependent on his tax return. However, since Rafeal was born in May 1983, Moore's 1982 tax return (covering 1982 and due April 15, 1983) could not have listed Rafeal because he had not yet been born
 
 
 [3]
 Pursuant to 28 U.S.C. § 636(c)(2), the parties consented to having a United States Magistrate Judge conduct all proceedings in this case, and the district court designated a magistrate judge for that purpose
 
 
 [4]
 Jones also held that the preponderance of the evidence standard, the usual civil burden of proof, applied in the absence of a constitutional statute. 329 S.E.2d at 802. Because, as we hold in Part II B below, Veeney satisfied the higher clear and convincing test, she would certainly have satisfied the preponderance standard